IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDWARD E. BARDLETT,            )
                              )      No. 12 C 2043
          Plaintiff,          )
                              )      Magistrate Judge Arlander Keys
     v.                       )
                              )
CAROLYN W. COLVIN,            )
,                             )
Commissioner of              )
Social Security,             )
                              )
          Defendant.

## MEMORANDUM OPINION AND ORDER

This case is before the Court on Edward Bardlett's motion for
summary judgment.  He seeks a remand or outright reversal of the
Commissioner's decision to deny his application for Disability
Insurance Benefits and Supplemental Security Income.  For the reasons
set forth below, Plaintiff's motion is granted and the case is
remanded to the Commissioner for further proceedings.

## BACKGROUND

On December 17, 2009, Plaintiff, Edward E. Bardlett, applied for
Disability Insurance Benefits ("DIB") and Supplemental Security Income
("SSI"), alleging that he became disabled as of April 1, 2007 due to
bouts of swelling in his hands, feet, throat, tongue, and other areas
caused by non-histaminergic angioedema.  (R. at 10, 27).  His
application was denied initially and upon reconsideration.  (R. at
10.)  Mr. Bardlett requested a hearing before an administrative law

judge, and the case was assigned to ALJ Victoria Ferrer, who held the requested hearing on August 8, 2011. (R. at 10, 23).

## I. Plaintiff's Hearing Testimony

At the hearing before the ALJ, Mr. Bardlett appeared by video, represented by counsel. (R. at 25.) He testified that he was 49 years old. (R. at 27.) With regard to work history, he testified that his last full time employment was "probably in '08" which consisted of "doing office work." (R. at 28.) Mr. Bardlett testified that at some point in 2008 he lost that job and then applied for unemployment benefits. (R. at 28.) He testified that, thereafter, he began working for the City of Chicago as a traffic controller, which was his last place of employment. (R. at 27-28.) He testified to working part time, meaning less than five days a week with the hours ranging between 16 and 40 hours per week, though his hours exceeded 40 about twice per month. (R. at 28-29.) Mr. Bardlett testified that he was laid off by the City of Chicago in October of 2009. (R. at 29.) Mr. Bardlett testified that he applied for multiple positions, including telemarketing and janitorial positions, but did not obtain employment. (R. at 29.)

Mr. Bardlett testified that he lost his job with the City of Chicago due to a condition called "angioedema" which causes "flare-ups" of swelling in areas like his hands, feet, tongue, and throat. (R. at 30-31.) He testified that he believes the

flare-ups began around three and a half to fours years ago, when he was still employed by the City of Chicago.  (R. at 33.)  He testified that the flare-ups vary in their severity and location and can occur at any time of the day without warning.  (R. at 30, 40.)  He testified, for example, that he might wake up with swelling in various areas.  (R. at 40-41.)  He testified that the worst of such "flare-ups" includes swelling in his throat and tongue, making it very difficult to swallow or speak.  (R. at 30.)  He testified that he has experienced these extreme flare-ups around 10-15 times in the past three and a half years, that they are life-threatening, and require hospitalization.  (R. at 30-31.)  Mr. Bardlett testified that, when an extreme flare-up occurs, he takes himself to the hospital, where he is administered medicine intravenously that causes the swelling to completely subside within 12 to 72 hours.  (R. at 33.)  He testified that his hospital stays range from eight to 72 hours.  (R. at 42.)  He testified that the minor flare-ups (i.e. those that are not life-threatening) consist of swelling in his hands, including his fingertips, and feet that make it painful and difficult to walk or carry and manipulate items, the latter due to a reduction in tactile sensation.  (R. at 31, 34, 41.)  Mr. Bardlett testified that the minor flare-ups occur about two to three times per month, even when he is regularly taking medication to treat his condition, and about three to four times

per month when he is not regularly taking the medication.  (R. at 31, 42.)  He testified that, when the minor flare-ups occur, his course of action is to take his home prescription and then rest in bed while waiting for the swelling to subside.  (R. at 31, 41.)  He testified that he avoids standing during this time, though he could stand "for a while" if he forced himself despite the pain in his feet.  (R. at 41.)  Mr. Bardlett testified that his wife and two daughters help him get around the house when he has swelling.  (R. at 42.)  He testified that the home prescription stops the swelling within one to three hours, though it takes 12 to 72 hours for the swelling to completely subside and for him to regain sensation in the swollen areas.  (R. at 32, 41.)

Mr. Bardlett testified that, in addition to angioedema, he has diabetes, elevated cholesterol levels, and arthritis in his right knee.  (R. at 34.)  He testified that he treats his diabetes with medication and his arthritis with over-the-counter pain pills.  (R. at 34-35.)  He testified that on at least two occasions, the arthritis, combined with the angioedema symptoms, made the pain so severe that he could not walk.  (R. at 34.)  He also testified that he underwent surgery for abscesses in 2010, and after the surgery he "healed up" and has been "fine from that."  (R. at 35.)

Mr. Bardlett testified that, while on the job as a traffic controller, he would try to "fight through" the pain and swelling of minor flare-ups, whereas extreme flare-ups forced him to the hospital and thus off work for the time being. (R. at 33.) He testified, for example, that if his feet swelled, his supervisor would allow him to either take a break or direct traffic from the sidewalk instead of the street. (R. at 36.) He testified that, during an eight hour shift, he might have to take a couple of breaks; if traffic was not very busy, he was allowed to break for a few minutes for every few hours or so. (R. at 36.) He testified that he has missed several days of work per year because of hospitalizations for extreme flare-ups. (R. at 37.) He testified that he also had to miss work once or twice per month when the swelling in his feet became too severe to report to his job. (R. at 37.)

With regard to his medication treatment for angioedema, Mr. Bardlett testified that, before he was diagnosed with angioedema, his doctors believed that the swelling was an allergic reaction to medications he was already taking, and they continuously changed his medications to no avail. (R. at 33.) He testified that, even after he was diagnosed with angioedema, the medication that was prescribed to treat the condition, tranexamic acid, was not available in the United States and would need to be ordered from overseas. (R. at 38.)

He testified that initially he ordered the drug from a pharmacy in Australia, where the drug was the least expensive, and then later from Canada. (R. at 38.)  Mr. Bardlett testified that, because it could take anywhere from eight to twenty-one days for the drug to arrive, he attempted to order the drug as far in advance as was possible. (R. at 38.)  He testified that, nevertheless, there would be periods of time when he would not have any medication. (R. at 38.)  He testified that the swelling, either of the minor or extreme variety, would occur if he missed his medication for a day or two. (R. at 38.)  He testified it was somewhat difficult to afford the overseas medication. (R. at 40.)  He testified that also he missed doses due to his initial hesitancy in taking the medication. (R. at 39.)  He testified that he was hesitant because the drug's side effects, "as it was explained to [him]" included color blindness, which he misunderstood as blindness. (R. at 39.)

He testified that, as a result of his hesitancy, he avoided taking the drug for several months after being prescribed, during which time he made multiple visits and stays at the hospital. (R. at 39-40.)  He testified that eventually his hesitancy wore off and he began taking the medication "as a preventative" after his doctor explained to him that the benefits far outweighed the potential side affects. (R. at 40.)  He testified that he has not experienced any side effects from the drug. (R. at 42-43.)

Mr. Bardlett testified that the drug became available in the United States about two years ago, that he began taking the U.S. drug in January of 2011, and that he currently no longer misses doses. (R. at 39.) Mr. Bardlett testified that, since he has become consistent with his medication, he has not experienced a flare-up severe enough to require hospitalization. (R. at 40.)

## II. Vocational Expert's Hearing Testimony

The ALJ also heard testimony from Ronald Malick, a Vocational Expert ("VE") who had reviewed Mr. Bardlett's work record and exhibit file and heard Mr. Bardlett's testimony before the ALJ. The VE testified that Mr. Bardlett's traffic controller job constituted a skilled position of medium physical demand under the Dictionary of Occupational Titles and that a hypothetical person with the physical limitations similar to those experienced by Mr. Bardlett could no longer perform his job. (R. at 43.) The VE then testified that Mr. Bardlett would be limited to entry level, unskilled positions of light physical demand, and that Mr. Bardlett's age, education, and work history narrowed this category to the following jobs existing in the national and regional (Illinois) economy: ticket seller (3,200 Illinois/78,600 nationally), labeler (9,200 Illinois/73,600 nationally), routing clerk (17,700 Illinois/447,600 nationally),

cashier (117,000 Illinois/2.9 nationally), and office helper (700 Illinois/ 14,600 nationally). (R. at 44-45.)

The VE testified that the labeler and routing clerk jobs would be eliminated if the hypothetical person required a sit/stand option with alternating intervals of one hour. (R. at 45.) The VE then testified that the ticket seller job would be eliminated if the hypothetical person was limited to "frequent[]" handling and fingering-i.e. because of swelling in the hands-but did not need the sit/stand option. (R. at 46.) Further, the VE testified that the ticket seller, labeler, and routing clerk jobs would be eliminated if the hypothetical person was both limited to frequent handling and fingering and needed the sit/stand option. (R. at 46.) The VE also testified that, if the hypothetical person's degree of handling and fingering was further limited to "occasional," the office helper and cashier jobs, in addition to the ticket seller job, would be eliminated. (R. at 47.)

The VE also testified that, if the individual required two or more days off a month because of a medical condition, all work in any of the before-mentioned hypotheticals would be eliminated. (R. at 48.) The VE also testified that, if a person's productivity level consistently falls below 80% by, for example, getting "off-task" because of pain, that person will not maintain employment. (R. at 48.) He testified that, when a person is

"off-task" depends on the job: a cashier or ticket seller, for example, need only be "on-task" when customers are present, whereas a traffic controller must remain on-task while he is out on the street, and a traffic controller who is off-task for more than five percent of the time will not maintain that job. (R. at 48.)

III. Medical Record

*a. Angioedema Issues*

In addition to the testimony of Mr. Bardlett and the VE, the record before the ALJ includes a wealth of medical records primarily documenting visits to the ER of the West Suburban Medical in Oak Park for bouts of swelling. The record shows four such visits in 2006. On January 1, 2006, Mr. Bardlett was admitted for mild swelling in his lips and throat. (R. at 388.) He was diagnosed with oropharyngeal angioedema, specifically in the lips and uvula, and was given Benadryl, Solu-Medrol, and Pepcid by IV. (R. at 385, 388.) The medical record for that visit shows a past medical history of hypertension and hyperlipidemia. (R. at 384.) Progress notes do not show that the swelling reduced within the first two hours of treatment. (R. at 388-389.) The medical record further shows that Mr. Bardlett was on Lipitor, for hyperlipidemia, and Lisinopril, for hypertension, at the time. (R. at 387.) The attending

physician, Dr. Eugene Kim, indicated his belief that the swelling was caused by an allergic reaction to Lisinopril and so switched Mr. Bardlett to Nifedipine, a calcium channel blocker. (R. at 389, 427.)

On April 5, 2006, Mr. Bardlett again visited the ER of West Suburban for mild tongue swelling, where he was diagnosed with angioedema and an allergic reaction. (R. at 394.) He was given Solu-Medrol, Pepcid, and Benadryl by IV. (R. at 396.) Progress notes show that he felt better within an hour of treatment. (R. at 396.) The medical record indicates that Mr. Bardlett was still taking Lipitor at the time of the visit, but a treatment note by Dr. Kim instructs Mr. Bardlett to "stop Lipitor" as the swelling might be due to an allergic reaction to the drug. (R. at 395, 397, 427.) By this time, Dr. Kim had taken Mr. Bardlett off of Nifedipine, also for allergy purposes, and substituted hydrochlorothiazide. (R. at 395, 429.)

On October 26, 2006, he was admitted for mild swelling in his tongue and throat that made it difficult for him to swallow and speak. (R. at 399.) He was diagnosed with angioedema of the uvula and was given Solu-Medrol, Benadryl, Pepcid, and Solu-Medrol. (R. at 399.) Progress notes show that the treatment reduced the swelling over the next couple of hours and that he felt much better by the next day. (R. at 400-401, 420.) Progress notes also indicate that Mr. Bardlett had been

prescribed Zetia two months before but was instructed by his PMD to stop Zetia when he noticed tongue swelling days before this visit.  (R. at 405.)

On November 1, 2006, Mr. Bardlett was admitted for swelling in his throat and tongue and was diagnosed with angioedema.  (R. at 427, 430.)  Specifically, progress notes show that the attending physician, Dr. John Kouklakis, believed Mr. Bardlett suffered from "allergic angioedema."  (R. at 429.)  For that, Dr. Kouklakis immediately started Mr. Bardlett on Prednisone and also kept Mr. Bardlett on hydrochlorothiazide for hypertension.  (R. at 429-430.)  Progress notes show that Mr. Bardlett felt better by the next day.  (R. at 439.)

During the October 26, 2006 visit, the attending physician, Dr. Don Williams, completed a Physician Orders for Consultation form, instructing Mr. Bardlett to consult with a specialist, Dr. Edward Lisberg of the Asthma and Allergy Center of Chicago.  (R. at 413.)  Dr. Williams indicated the reason for the consultation as determining the underlying problem for Mr. Bardlett's "recurrent angioedema."  (R. at 413.)  Thereafter, on December 11, 2006, Mr. Bardlett consulted with Dr. Lisberg, where Mr. Bardlett filled out a questionnaire on his medical history.  (R. at 209-214.)  There, Mr. Bardlett indicated that he suffered from tuberculosis in 1971, high blood pressure in 2006, and elevated cholesterol in 1999, and that he had previously undergone a

coronary angiogram.  (R. at 209-211.)  On that same form, Dr.

Lisberg diagnosed Mr. Bardlett with angioedema and prescribed to

him the drug tranexamic acid to be taken orally daily.  (R. at

214.)

A consultation letter dated January 2, 2007 by Dr. Lisberg

to Mr. Bardlett's West Suburban primary care physician at the

time, Dr. Williams, reports a "summary of the findings and

recommendations" following the consultation.  (R. at 267.)  For

"impressions," Dr. Lisberg provides "Recurrent, Non-histaminergic

Angioedema."  (R. at 267.)  Under "recommendation," Dr. Lisberg

provides:

> Due to relative infrequency of episodes, and lack of
> severity to GI, respiratory system involvement, Mr.
> Bardlett has elected not to take tranexamic acid as
> preventive tx.  The use of this agent has been
> associated with reported reduction in frequency and
> severity of episodes. Due to ocular, renal, and possible
> > stroke-related side effects, Mr. Bardlett believes that
> > these side effects pose a potentially greater risk than
> > benefit at this time...If increased symptom severity or
> > frequency, re-evaluation regarding above tx, with
> > further recommendations for continuing care under your
> > supervision. If acute severe episode occurs, use of
> > tranexamic acid 1 g qid may be of benefit in reduction
> > of symptoms (note, that this agent is likely not
> > commonly stocked in hospital formulary."

(R. at 267.)

On January 9, 2007, Mr. Bardlett came to West Suburban

reporting a reoccurrence of swelling and was diagnosed with non-

histaminergic angioedema.  (R. at 777.)  Treatment notes show

that he elected not to take tranexamic acid, though previously

prescribed by Dr. Lisberg, out of concern of its side effects. (R. at 777.) He visited again on February 2, 2007, complaining of swelling in his throat that made it difficult for him to swallow. (R. at 302, 307.) The attending physician, Dr. Williams, again diagnosed Mr. Bardlett with non-histaminergic angioedema and admitted him to the ICU. (R. at 303.) The treatment notes show that Dr. Williams restarted Mr. Bardlett on Lipitor and hydrochlorothiazide while also prescribing Lamisil. (R. at 453, 455.) The treatment notes show that Mr. Bardlett still refused to take tranexamic acid in any form out of fear of its side effects. (R. at 307.) According to the treatment notes, tranexamic acid is the only treatment for non-histaminergic angioedema, but was not available in the United States at the time. (R. at 307, 311.) The treatment notes indicate that Mr. Bardlett's swelling "resolved" by the next day despite not taking tranexamic acid by IV. (R. at 311.)

Mr. Bardlett made a follow-up to this visit on February 6, 2007, reporting some swelling in his right knee. (R. at 780.) Treatment notes indicate "Dr. Lisberg will assist patient to resume tranexamic acid on an outpatient basis." (R. at 780.) Mr. Bardlett again visited West Suburban on February 22, 2007, complaining of a "lump" in his throat, and was diagnosed with non-histaminergic angioedema. (R. at 263.) Treatment notes show that he agreed this time to take tranexamic acid by IV, which

reduced the swelling within a couple of hours, and was soon after discharged. (R. at 262, 469.)

The record further indicates that Mr. Bardlett was diagnosed with obesity during a visit to West Suburban on 1/22/08, morbid obesity on 6/5/09, and diabetes on 3/30/09. (R. at 258, 282, 583.) For the latter, Mr. Bardlett was prescribed Metformin and discussed home care for his diabetes with the attending physician, Dr. Paula Oldeg, including proper diet and weight loss. (R. at 253, 260.)

The record documents 19 more visits by Mr. Bardlett to the West Suburban ER for flare-ups on the following dates: 4/19/07, 9/4/07, 9/14/07, 1/22/08, 3/3/09, 4/6/09, 6/3/09, 6/5/09, 6/9/09, 8/12/09, 1/4/10, 1/8/10, 2/14/10, 4/5/10, 7/1/10, 7/5/10, 8/23/10, 8/27/10, 9/2/10, 11/21/10. Treatment notes for these visits show Mr. Bardlett complaining of swelling to his throat, tongue, face, and/or lips, all symptoms of angioedema. (R. at 240, 271, 284, 295, 326, 332, 342, 366, 548, 606, 632, 647, 745, 753, 773, 788, 794, 831.) Treatment notes show that the swelling had existed anywhere between 2-24 hours prior to the visit. (R. at 240, 248 272, 287 295, 303, 338, 606, 632, 712, 831.)

Treatment notes show that Mr. Bardlett sometimes reported difficulty breathing, swallowing and/or tightening in his throat. (R. at 240, 272, 287, 295 301, 307, 345, 366, 550, 583, 595, 634, 759.) Treatment notes show that, during some visits, Mr.

Bardlett also complained of swelling in his hands and feet, and in one case his knees. (R. at 240, 272, 287, 753.) Treatment notes show that the swelling was classified as "acute," "severe," or "chronic" on six visits during this period-on 9/14/07, 4/6/09 6/3/09, 2/14/10, 4/5/10, 7/5/10, 8/27/10-and mild to moderate on the rest. (R. at 248, 328, 335, 342 495, 550, 751.)

The treatment notes also show that Mr. Bardlett was administered tranexamic acid by IV during each visit, typically after consultation with Dr. Lisberg by the attending physician, normally 1 gram every 2-4 hours for up to 12-16 hours, depending on Dr. Lisberg's instruction, and monitored for improvement over that period. (R. at 242, 248, 272, 284, 298, 305, 326, 334, 342, 366, 548, 553, 586, 596, 606, 632, 647, 654, 745, 756, 776, 833.) Treatment notes show that the IV treatment typically reduced the swelling within a few hours. (R. at 244, 252, 272, 275, 328, 336, 344, 369, 494, 517, 595, 650, 747, 770, 836.)

Treatment notes indicate that Mr. Bardlett was often kept overnight and into the next day in the ICU to monitor further reduction in swelling, with particular attention paid to his airway, and discharged after it was determined either that he was stable, had no blockage in his airway, or that the swelling had fully "resolved." (R. at 279, 285, 300, 371, 564 586, 596, 624 642, 661, 726 747, 758, 775.) Treatment notes for the 4/5/10 visit show that he was kept two nights because the hospital's

plan was to discharge Mr. Bardlett upon arrival of his shipment of tranexamic acid from Canada. (R. at 345-346, 701.) Treatment notes for his 11/21/10 visit show that he was not discharged until 11/24/10, at which point there was "minimal facial swelling" and the swelling was deemed "resolved." (R. at 850, 854, 856.) Treatment notes for this visit again indicate that Mr. Bardlett was kept longer in the ICU in part to await arrival of his tranexamic acid shipment. (R. at 857.)

Treatment notes show that he was discharged on a few occasions without an overnight stay in the ICU, either because the swelling fully "resolved" or he was deemed sufficiently stable within a few hours. (R. at 242, 250, 331.) The treatment notes further reflect that most of these flare-ups resulted from Mr. Bardlett running out of tranexamic acid, as prescribed by Dr. Lisberg, and thus missing doses over one or more days as Mr. Bardlett was waiting for more of the drug to arrive from Australia and later Canada. (R. at 240, 248, 279, 284, 299, 346, 366, 595, 606, 643, 647, 833, 857.)

Treatment notes for two visits, on 4/6/09 and 2/14/10, indicate that Mr. Bardlett was taking his home prescription of tranexamic at the time of the visit. (R. at 336, 550.) Treatment notes for two other visits, on 7/5/10 and 8/23/10, are ambiguous as to whether Mr. Bardlett was on the drug, as they

both advise Mr. Bardlett to continue with his home medications but fail to indicate that he had run out.  (R. at 331, 745.)

Treatment notes show that, following each visit, Mr. Bardlett was advised to stay on his home regime of tranexamic acid, as directed by Dr. Lisberg, make a follow-up appointment with his primary care doctor at West Suburban, and return for reoccurrences of swelling in his face or throat.  (R. at 281, 333, 245, 254, 279, 290, 300, 325, 331, 333, 346, 528, 538, 728, 744, 815.)  Treatment notes show the "trigger" for the flare-ups remained unknown throughout this period.  (R. at 280, 488, 626, 836.)    Treatment notes indicate that Mr. Bardlett continued to be treated and take medication for diabetes, hypertension, and high cholesterol throughout this period.  (R. at 372, 496, 524, 559, 583, 615, 637, 659, 716, 762, 815, 839, 929.)

The record further contains treatment notes by Dr. Lisberg dated 4/7/09, 4/13/09, 6/3/09, 10/22/09, 4/22/10, and 7/1/10, documenting consultations with Mr. Bardlett, consisting of Mr. Bardlett contacting Dr. Lisberg with complaints of tongue/throat swelling because of missed doses and Dr. Lisberg advising Mr. Bardlett to proceed to the hospital.  (R. at 224-225, 227,  229, 231-232.)  For the 4/13/09 note, Dr. Lisberg indicated that Mr. Bardlett:

> had reduced tranexamic acid to 500 mg bid with
> episodic mild  breakthrough~once weekly. Patient
> states 3/16/09 episode abated with 1 mg tid

17

for          a few days.  Notes episode 4/7/09 tongue
swelling        after awakening and noted progression within
few  hours and unable to swallow additional pills due to
tongue swelling. Patient with prompt response to ER
without further progression...

(R. at 232.)

The 4/13/09 treatment note shows that Dr. Lisberg

recommended that Mr. Bardlett increase his daily tranexamic acid

dosage to 1 g, and further prescribed 1 g IV doses of tranexamic

acid "for patient home supply to be administered in ER or

hospital setting." (R. at 232). Dr. Lisberg also indicated that

"as patient w/o any acute episodes on 1 gm bid TA; advise to

maintain at this dose as no side effects." (R. at 232.)

On 6/3/09, Dr. Lisberg noted, "stressed to pt not to wait re

rx re-order." (R. 229.) On 4/22/10, he noted "pt stable if w/o

missing doses but readily acute exacerbation w/o rx." (R. at

225.) On 7/1/10, he noted "Asked patient as to why he again has

allowed his rx to run out without backup, states 'other issues

going on in life'; he understands that without his rx he is at

risk for potential life threatening episode." (R. at 224.) On

10/22/10, he noted "Pt states 'cannot miss medicine without

having swelling episode'...Pt changed to Canadian pharmacy and

without missing refills." (R. at 227.) Dr. Lisberg also noted

that "w/o sign episodes on tranexamic acid w/o over side

effects." (R. at 227.)

The record shows that Dr. Lisberg penned another consultation letter, dated April 14, 2009, to Mr. Bardlett's West Suburban primary care physician at the time, Dr. Thomas Albert, providing an updated "summary of findings and recommendations" based particularly on the 4/13/09 visit. (R. at 215.) Under "impression," Dr. Lisberg provides:

> Spontaneous, recurrent angioedema...Patient symptoms resolved with Tranexamic acid, dosed between 250 and 1000mg/d; patient experiencing weekly mild episodes at dosing of 250 mg bid. Previous exacerbations related to missed rx doses, without other apparent etiology...No evidence of thrombotic, liver, or color vision rx side effects.

(R. at 215.)

Under "recommendation," he provides:

> Patient advised to increase daily Tranexamic acid to 500
> mg bid [twice daily]...It would likely be useful for Mr. Bardlett to maintain a home supply of intravenous Tranexamic acid for him to bring on travel or to any ER facility for acute treatment as it is unlikely that emergency care facilities will have this medications available...Re-evaluation in 6 months, with further recommendations for continuing care under your supervision.

(R. at 215.)

b. Non-Angioedema Issues

The record also indicates visits to West Suburban for non-angioedema related issues. On May 13, 2007, Mr. Bardlett underwent an echocardiogram with doppler. (R. at 784.) The

reviewing physician, Dr. Lou Ivanovic, noted in his conclusion:
"Dilated, mildly hypertrophic left ventricle. Normal systolic
function. Left atrial enlargement." (R. at 784.) On June 14,
2007, Mr. Bardlett underwent an x-ray of his right knee because
of pain. (R. at 783.) The reviewing physician, Dr. Williams,
found:

> 13 mm smoothly marginated calcific density in the
> anterior joint space suggestive of a loose body.
> Moderate narrowing of the patellofemoral compartment.
> No evidence of acute fracture or dislocation.
> Moderate suprapatellar joint effusion.
> (R. at 783.)

On December 11, 2010, Mr. Bardlett was admitted to have
abscesses on his abdomen and buttocks removed. (R. at 886.) A
Consultation Report completed prior to surgery indicates that Mr.
Bardlett had "recurrent deep subcutaneous abscesses" over the
past 3 years "which he has managed successfully with warm, moist
packs." (R. at 920.) The report indicates that the decision to
surgically treat these abscesses was made after they had grown
"rapidly" within the past week and became "associated with pain,
tenderness, fever, and chills." (R. at 920.) The record shows
that the attending surgeon, Dr. Fred Tiesenga, performed
successful operations on the abdomen and buttocks abscesses on
December 13 and 15, respectively, and discharged him on the 17th.
(R. at 886, 888, 900.) A December 12 treatment note shows that,
since Mr. Bardlett received his tranexamic acid prescription two

days prior, he had experienced flare-ups, and that since his last hospitalization at West Suburban for a flare-up-on 11/24/10-he experienced "daily non-life threatening episodes." (R. at 959.) The record shows that Mr. Bardlett took all of his doses of tranexamic acid per his prescription during this stay. (R. at 997, 1007, 1012, 1017.) Treatment notes further show that Mr. Bardlett had facial and tongue swelling at the time of the 12/13/10 operation. (R. at 954.) Treatment notes show that, prior to discharge, Mr. Bardlett was instructed on how to self-administer wound care at home for the affected areas. (R. at 921.)

On May 3, 2011, Mr. Bardlett underwent a colonoscopy for rectal bleeding. (R. at 1037.) The performing physician, Dr. Kamran Heydarpour, noted that "[i]nternal grade II hemorrhoids were found. Otherwise, the colon appeared to be normal. No masses, polyps, or diverticuli were seen." (R. at 1039.) Treatment notes show that his last dose of tranexamic acid came the previous day. (R. at 1042.)

The record further documents follow-up visits for some of Mr. Bardlett's flare-up hospitalizations-on 3/6/07, 4/24/07, 5/29/07, 8/14/07, 1/29/08, 3/18/08-follow-ups for hypertension on 6/17/08, 10/28/08, and 11/25/08, for diabetes on 4/30/09, 5/21/09, 7/2/09, 9/17/09, 11/19/09, and 2/11/10, and routine check-ups on 1/15/08 and 10/08/09. (R. at 781, 782, 785, 786,

794, 795, 796, 797, 798, 802-807, 810.)  Treatment notes for the
1/15/08 check-up show that Mr. Bardlett was experiencing
"occasional swelling" in his feet and hands and for the 2/11/10
visit, plantar fasciitis.  (R. at 790, 810.)  Treatment notes for
the 11/25/08 visit also show that Mr. Bardlett was currently
experiencing swelling in his throat and difficulty swallowing.
(R. at 797.)  Treatment notes for the angioedema-related follow-
ups indicate that Mr. Bardlett consulted with Dr. Lisberg
following the flare-up hospitalizations to have his prescription
of tranexamic acid refilled, but that in a couple of cases, he
was still waiting for the shipments to arrive at the time.  (R.
at 781, 782, 785, 786, 795, 706, 798.)

        Treatment notes for the 8/14/07, 3/18/08, 6/17/08 and
10/28/08 follow-up shows that Mr. Bardlett expressed an
improvement in his angioedema.  (R. at 786, 795, 798, 796.)
Notably, treatment notes for the 10/28/08 follow-up show that Mr.
Bardlett's last flare-up was in January of 2008.  (R. at 798.)
Further, treatment notes for the 6/17/08 visit show that Mr.
Bardlett was taking his tranexamic acid prescription regularly.
(R. at 796.)  Treatment notes for the 1/15/08 and 3/18/08 also
indicate that Mr. Bardlett was "resuming" his doses of tranexamic
acid.  (R. at 790, 795.)

IV. Mr. Bardlett's SSA Filings

On February 23, 2010, Mr. Bardlett completed a Function Report, in which he stated that, despite his condition, he is able to function normally for the most part. (R. at 159.) For his daily routine, he stated that he wakes up around 4 or 5 a.m. and eats breakfast a couple hours later. (R. at 158.) He stated that, from mid-morning to late afternoon, when he has no swelling, he devotes much of his time to religious studies, including attending religious meetings at his church. (R. at 158.)

He stated that he closes the day by eating dinner, taking medications, and sometimes watching television before going to bed. (R. at 158.) He stated that his wife prepares most meals, though he is able to prepare simple things like sandwiches, taking him from a few minutes to an hour or more to complete. (R. at 161.) He further stated that he can perform household chores, when not swollen, like doing laundry, washing dishes, and cleaning, again taking him from a few minutes to an hour or more. (R. at 161-162.)

He testified that he does not drive, but goes out daily either by walking or public transportation. (R. at 163.) He stated that, in addition to attending religious meetings twice a week, he goes out weekly to shop for items like groceries or clothes, and occasionally to see friends or a movie. (R. at 163-164.) He stated that, when the flare-ups do occur, they come on

23

rapidly and without warning, preventing him from performing most of his normal activities. (R. at 164.) He stated that the swelling makes it difficult for him to speak, see, walk, use his hands, sleep, swallow, and breathe. (R. at 159.)

He stated that swelling, particularly in his throat and/or tongue, has hospitalized him 17-21 times in the past 2 ½ to three years, and that the swelling in his hands and feet make it difficult to perform simple tasks like dressing, shaving, eating, and combing his hair. (R. at 159.) On the list of items affected by his impairments, Mr. Bardlett checked 8 of the 19 boxes: lifting, standing, walking, kneeling, talking, stair climbing, completing tasks, and using hands. (R. at 165.) In terms of walking, Mr. Bardlett indicated that he can walk several blocks before needing to stop and rest. (R. at 165.) Those that he did not check are squatting, bending, reaching, sitting, hearing, seeing, memory, concentration, understanding, following instructions, and getting along with others. (R. at 165.)

He indicated below these boxes that he has a normal attention span, follows written and spoken instructions "very well," gets along well with authority figures, handles stress normally, and feels "o.k." with changes in his routine. (R. at 165-166.) Mr. Bardlett noted that his "disabling condition," non-histaminergic angioedema:

> is generally controllable-but not curable-with special
> medication. However, even with the medication I have
> experienced 'break through' episodes of swelling,
> ranging in degree from mild to severe. While there are
> no known or conclusively known triggers for episodes
> of swelling, I have noticed that periods of increased
> stress, exposure to cold and/or intense sunlight, and
> trauma (bumps, dental work, etc) do seem to cause
> swelling in my case.

(R. at 168.)

Finally, in response to a question about "unusual behavior or fears," he stated that he fears "the unpredictable nature of my condition and not knowing what might trigger the swelling," "new or unfamiliar circumstances [like] activities, foods," and "being far from the hospital where I know I can receive the needed medical attention should an emergency arise." (R. at 165-166.)

Mr. Bardlett also completed a Disability Report that is undated. (R. at 147-156.) He described himself as 5'7" and weighing 325 lbs. (R. at 148.) He claimed non-histaminergic angioedema, diabetes type 2, and hypertension as conditions limiting his ability to work. (R. at 148.) For the "Work Activity" section, he claimed that he stopped working on October 1, 2008 "[b]ecause of other reasons" including "a dispute of my time off for medical and personal leave." (R. at 149.) He further claimed that his condition caused him to make changes to his work activity beginning on January 2, 2008, and that his

condition became severe enough to keep him from working beginning on June 1, 2009. (R. at 149.)

With regard to his job history, Mr. Bardlett described his traffic controller job as working "part time outside controlling traffic." (R. at 151.) He noted that he worked that job 8 hours per day, 4 days per week, and during an 8-hour workday, he walked for 2 hours, stood for 6 hours, stooped for 1 hour, and reached for 8 hours. (R. at 150-151.) He further noted that he "did not have to lift anything" for his job specifically, but that he "frequently" lifted 25 lbs., and that 20 lbs. was the heaviest he had lifted. (R. 138.)

V. RFC Assessment

On March 3, 2010, Dr. Towfig Arjmand, a non-examining consultative physician, completed a Physical RFC Assessment of Mr. Bardlett based on his review of Mr. Bardlett's medical record. (R. at 313-320.) Under "primary diagnosis," Dr. Arjmand noted non-histaminergic angioedema and diabetes mellitus, and under "secondary diagnosis" he noted hypertension and obesity. (R. at 313.) For exertional limitations, Dr. Arjmand determined that Mr. Bardlett could frequently lift or carry 10 lbs. and occasionally lift or carry 20 lbs; that he could sit, stand, and/or walk about 6 hours in an 8-hour workday; and that he had no limitations in his ability to push or pull. (R. at 314.)

Regarding postural limitations, Dr. Arjmand also determined that Mr. Bardlett could occasionally climb ramps or stairs, but never ladders, ropes or scaffolds; and could occasionally stoop, kneel, crouch, balance or crawl. (R. at 315.) Dr. Arjmand based his assessment of Mr. Bardlett's postural limitations on Mr. Bardlett's obesity. (R. at 316.) Dr. Arjmand further found no manipulative, visual, communicative, or environmental limitations. (R. at 316-317.)

Dr. Arjmand noted that Mr. Bardlett had a height of 5'7" and weighed 330, giving a BMI of 51, and that Mr. Bardlett was alleging non-histaminergic angioedema, type 2 diabetes, and hypertension. (R. at 320.) He also noted that Mr. Bardlett had a "history of recurrent angioedema. Does well on medication, when off of meds has exacerbations." (R. at 320.) Finally, he noted that Mr. Bardlett's "statements are credible and consistent with the objective medical findings." (R. at 320.)

On August 19, 2010, Dr. Marion Panepinto, a non-examining consultative physician, also completed a Physical RFC Assessment of Mr. Bardlett based on a review of Mr. Bardlett's medical record. (R. at 381.) Under "primary diagnosis," Dr. Panepinto noted angioedema and under "secondary diagnosis" she noted diabetes. (R. at 374.) For exertional limitations, Dr. Panepinto determined that Mr. Bardlett could frequently lift or carry 10 lbs. and occasionally lift or carry 20 pounds; that he

could sit, stand and/or walk for about 6 hours in an 8-hour workday; and that he had no limitations in his ability to push or pull.  (R. at 375.)

Where asked to explain her assessment of Mr. Bardlett's exertional limitations, Dr. Panepinto noted that "claimant was diagnosed in 2006 with angioedema...when medication is not used the claimant has c/o facial edema and tongue edema which is noted on exams.  He does respond well to the use of medication...He also has a diagnosis of hypertension which is well controlled with no evidence of related complications.  He was diagnosed in 2009 as diabetic.  Glucose 100...The claimant is obese with a BMI of 51.7."  (R. at 375-376.)

Regarding postural limitations, Dr. Panepinto determined that Mr. Bardlett could occasionally climb ramps or stairs, but never ladders, rope, or scaffolds; and could occasionally balance, stoop, kneel, crouch, or crawl.  (R. at 376.)  Dr. Panepinto based her assessment of Mr. Bardlett's postural limitations on his obesity.  (R. at 376.)  Dr. Panepinto further found no manipulative, visual, communicative, or environmental limitations.  (R. at 377-378.)

Dr. Panepinto further noted that Mr. Bardlett "has acute episodes of swelling if he does not use required medication to treat his condition.  If medicated he is viewed to be capable of performing SGA within the restrictions of the RFC.  There is no

TSS or controlling weight issue. Adl restrictions are seen as credible and supported by the evidence in file." (R. at 381.)

The record before the ALJ also includes a memorandum from Mr. Bardlett's attorney. (R. at 197-203). There, after summarizing the relevant procedural and medical histories, counsel for Mr. Bardlett argued that his impairments- non-histaminergic angioedema, degenerative joint disease in the right knee, and morbid obesity-meet or equal a listed impairment or, in the alternative, make him "functionally unemployable." (R. at 202.) For the latter, counsel argues that Mr. Bardlett is entirely precluded from "performing full-time, competitive work" because he regularly has flare-ups even when he is consistent with his medication. (R. at 202.)

## VI. ALJ's Decision

The ALJ issued her decision on September 2, 2011, finding that Mr. Bardlett was not disabled under sections 216(i) and 223 of the Social Security Act from April 1, 2007 through the date of her decision. (R. at 10-18.) The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a).

At step one, the ALJ determined that Mr. Bardlett had not engaged in substantial gainful activity since April 1, 2007 (the alleged onset date). (R. at 12.)

At step two, the ALJ determined that Mr. Bardlett had two severe impairments, angioedema and obesity, and two non-severe impairments, diabetes mellitus and high blood pressure. (R. at 12.)

At step three, the ALJ determined that Mr. Bardlett did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). (R. at 13.) She noted that "[h]is symptoms arising from angioedema have not affected him neurologically...He has not demonstrated that he meets any listing for a physical impairment even considering his obesity." (R. at 13.)

At step four, the ALJ concluded that, though Mr. Bardlett was not capable of performing his past work as a traffic controller based on the testimony of the VE, he had the RFC "to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b). He can sit for 6 hours in an 8-hour workday. He is limited to no climbing of ladders, ropes, or scaffold, and occasional climbing ramps/stairs, stooping, kneeling, crouching, or crawling, and frequent balancing." (R. at 13.) In making her decision, the ALJ noted that she considered all of his symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as required under 20 C.F.R. 404.1529 and SSR's 96-4p

and 96-7p.  (R. at 13.)  Additionally, the ALJ considered opinion evidence in accordance with 20 C.F.R. 404.1527 and SSR's 96-2p, 96-5p, 96-6p, and 96-3p.  (R. at 13.)  Next, the ALJ summarized Mr. Bardlett's testimony and medical record and stated:

> Thus, considering the claimant's allegations in light of his medical treatment history, the medical signs and findings, and the State agency medical doctors' opinions, I conclude that the claimant's testimony is  not totally credible and that the claimant has the residual functional capacity [to perform light work].

(R. at 16.)

At step five, the ALJ determined that, based on Mr. Bardlett's age, education, work experience, RFC, and the VE's testimony, "there are jobs that exist in significant numbers in the national economy that claimant can perform..." (R. at 17.) The ALJ determined that Mr. Bardlett would be able to work as a ticket seller (3,200 Illinois/78,600 nationally), labeler (9,200 Illinoi/73,600 nationally) or routing clerk (17,700 Illinois/447,600 nationally).  (R. at 18.)

Mr. Bardlett requested review by the Appeals Council, but was denied on February 16, 2012.  Thus, the ALJ's decision became the final decision of the Commissioner.  Mr. Bardlett filed a complaint with this court on March 21, 2012, seeking a review of the decision.  The parties consented to exercise of jurisdiction by a magistrate judge on July 25, 2012.  Thereafter, cross-motions for summary judgment were filed.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g). Mr. Bardlett asks the Court to reverse the Commissioner's decision denying him benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

## Standard of Disability Adjudication

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five-step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his/her past relevant work, and fifth; the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405 (g); *Steele v. Barnhart*, 920 F.3d 936, 940 (7th Cir.2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering acts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is insufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

<u>Discussion</u>

Mr. Bardlett argues that the ALJ's decision should be reversed or remanded because she failed to discuss Mr. Bardlett's ability to engage in full-time work for the RFC determination; failed to address a conflict between her RFC determination and those of the SSA medical consultants; and failed to make a proper credibility determination.

*I. The ALJ's Failure to Address a Conflict Between her RFC Determination and Those of the SSA Medical Consultants*

First, Mr. Bardlett argues that the inconsistency in the ALJ finding that he could balance frequently, as opposed to Dr. Arjmand and Dr. Panepinto's finding that Mr. Bardlett could balance only occasionally, merits remand. Pl's brief at 13. Mr. Bardlett also notes that the ALJ's finding is inconsistent with her assertion that she gave significant weight to these doctors' opinions. *Id.* at 14.

This is harmless error. "No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989); See also *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (noting that a court need not remand upon judicial review of an agency action where doing so would be a "useless formality"). The VE found that the hypothetical

individual with Mr. Bardlett's vocational profile and who could balance frequently, along with the other characteristics, could work as a ticket seller, labeler, or routing clerk. (R. at 43-44). As the Commissioner notes, neither of those jobs require any balancing. See U.S. Dep't of Labor, Employment & Training Admin., *Dictionary of Occupational Titles*, 211.467-030, 920.687-126, 222.587-038 (4th ed. 1991); Def's brief at 9. Remand, therefore, would be a "useless formality." *Wyman-Gordon*, 394 U.S. at 766, n.6.

## II. The ALJ's Credibility Assessment

Next, Mr. Bardlett challenges the ALJ's finding that his complaints of debilitating swelling in his extremities were not fully credible, arguing that the ALJ erroneously identified inconsistencies between his complaints of minor flare-ups (i.e. swelling in the extremities) and the record. Pl's brief at 8.

Because an ALJ is in the best position to assess the credibility of a claimant, a court will afford the ALJ's credibility assessment special deference, and will only find against the credibility assessment where it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000). An ALJ's credibility assessment is "patently wrong" where it "lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008). In making this assessment, a court will not "nitpick

the ALJ's opinion for inconsistencies" but rather "give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010).

As the ALJ noted, when she made her RFC determination, she considered, in accordance with 20 CFR §§ 404.1527 and 404.1529, 1) "whether there is an underlying medically determinable physical or mental impairment(s)...that could reasonably be expected to produce the claimant's pain or other symptoms" and, if so, 2) "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." (R. at 13-14.) For the latter, the ALJ must make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms where those statements are not supported by objective medical evidence in the record. SSR 96-7p; (R. at 14.)

Mr. Bardlett argues that the ALJ's determination that the objective medical evidence in the record did not support his complaints of difficulty lifting, standing, kneeling, climbing, stairs, walking, seeing, or using his hands misses the fact that Mr. Bardlett only went to West Suburban for exacerbations in his throat, tongue, and/or face. Pl's Br. at 9. It makes sense, Mr. Bardlett argues, that the record would almost exclusively document extreme flare-ups while lacking documentation for mild

flare-ups. *Id.* Mr. Bardlett testified that swelling in his hands and feet caused him to miss 2-3 days of work per month as a traffic controller, even when he was on his medication, and made his work extremely difficult when he was on the job. (R. at 31, 33, 36.) He testified that, for minor flare-ups, he would <u>not</u> go to the hospital, but instead rest at home and take his prescription of tranexamic acid, relieving him of swelling within 12-72 hours. (R. at 31-32, 41.)

An ALJ "may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009) (citing SSR 97-7p; 20 C.F.R. § 404.1529(c)(2)); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir.2006); *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir.2000). However, that appears to be what has occurred. The ALJ noted, for example, that "the claimant reported that he had pain and discomfort due to bilateral hand and foot swelling" but the "frequency of his alleged symptoms is not supported by the medical record." (R. at 15.) The ALJ first acknowledges the need to look beyond the record and to the claimant's statements where the record lacks objective evidence, as is the case here, yet still characterizes a lack of objective evidence on this subject as an "inconsistency." (R. at 14-15.)

The record does document a few instances in which Mr. Bardlett complained of swelling in his extremities to the doctors at West Suburban, thus accounting for the ALJ's characterization of such complaints as "infrequent." (R. at 15, 240, 272, 287, 753, 790.) But again, the occurrence of these symptoms was only incidental to the purpose for all of Mr. Bardlett's angioedema-related visits: for extreme, life-threatening flare-ups. Support for the frequency of minor flare-ups as claimed by Mr. Bardlett will not be found in the medical record because he self-treated them.

That is not to say that the ALJ completely neglected to look at subjective evidence to spot inconsistencies, but the attempt does not provide for a meaningful review. In regards to daily living, the ALJ noted that "claimant's description of his activities of daily living are inconsistent with his claim of total disability at all exertional levels. He reported that he prepared meals, cleaned, did laundry, washed dishes, ironed, shopped, and read (Exhibit 53)." (R. at 16).

The Court finds no inconsistency herein. Mr. Bardlett never testified to his condition completely precluding him from performing daily activities. On the contrary, he testified that the unpredictable nature of his swelling outbreaks, including in his extremities, means he can perfectly perform daily activities

on some days, and is entirely incapacitated on others. (R. at
161-162); Pl's brief. at 7.

While it is true that a claimant's daily activities "are
relevant and must be considered under the Social Security
regulations" in assessing a claimant's credibility, *Masters v.
Astrue*, 818 F. Supp. 2d 1054, 1069 (N.D.Ill.2011), an ALJ "must
minimally articulate his reasons for crediting or rejecting
evidence of disability." *Clifford*, 227 F.3d at 870 (finding that
the ALJ did not provide any explanation for his belief that the
claimant's daily activities of walking, shopping, and doing
household chores were inconsistent with his treating physician's
opinion that he was severely limited in his ability to perform
work requiring any standing or walking, and that the ALJ's
failure to do so constitutes error.) (quoting *Scivally v.
Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992).  The ALJ also
failed to do so by making no mention of the episodic nature of
Mr. Bardlett's condition when discussing his daily activities.

Regarding medical improvement, the ALJ notes that the:

> claimant testified that his condition has remained
> stable or improved a little bit with the
> medication. He stated that medication diminishes
> left knee pain. As to the swelling, he testified
> that he takes medications for bilateral hand and
> foot swelling until his symptoms subside, which
> according to his testimony, take a couple of hours
> for the swelling to begin to cease and up to 72
> hours to completely      cease.

> The medical record establishes that his condition
> improved. Hospital treatment for respiratory
> symptoms decreased over time.

(R. at 16.)

Again, the ALJ does not identify how Mr. Bardlett's testimony on this matter creates an inconsistency. The record undoubtedly shows that a consistent regime of tranexamic acid ultimately halted hospitalizations for his extreme flare-ups, and Mr. Bardlett does not deny this. (R. at 31, 40, 959.) But the ALJ fails to explain how this improvement, specifically towards his extreme flare-ups, is inconsistent with his complaints of unrelenting minor flare-ups. Mr. Bardlett testified that taking his home prescription of tranexamic acid always relieves swelling in his hands and feet within 12 to 72 hours, but he never claimed that the swelling in these areas no longer plagues him. (R. at 40-41.)

Mr. Bardlett also challenges the ALJ's identification of an inconsistency pertaining to his extreme flare-ups. The ALJ noted that Mr. Bardlett's initial "non-compliance" casts credibility doubts on his complaints of "breakthrough attacks of swelling with medication," because most of his extreme flare-ups resulted from missed medications. (R. at 15.) The Court is able to follow the ALJ's assessment of credibility in this instance. The medical record documents only two instances in which Mr. Bardlett was hospitalized for an extreme flare-up despite being on his

medication.  (R. at 336, 550.) The rest of the record shows hospitalizations due to missed medication, giving the ALJ substantial reason to doubt Mr. Bardlett's assertion that he still suffered from extreme flare-ups despite taking his medication.  (R. at 240, 248, 279, 284, 299, 346, 366, 595, 606, 643, 647, 833, 857.)

This does not, however, alter the Court's finding that the ALJ did not properly account for Mr. Bardlett's minor flare-ups in the credibility assessment.  Again, in evaluating credibility, the ALJ considered non-compliance in connection only with Mr. Bardlett's extreme flare-ups, while omitting any mention of his minor flare-ups from this particular discussion.  The ALJ was free to diminish the credibility of Mr. Bardlett's statements that he still experiences minor flare-ups while on his medication due to this inconsistency. The ALJ, however, did not articulate such a connection.

The ALJ identified inconsistencies regarding Mr. Bardlett's work history.  First, the ALJ noted that Mr. Bardlett testified that he stopped working as a traffic controller in October 2009 after he was laid off.  However, he indicated in his disability report that he stopped working because of a dispute over his medical and personal leave.  (R. at 29, 149.)  The ALJ also noted that, after Mr. Bardlett stopped working, he received

unemployment benefits and continued to look for work.  (R. at 28-29.)

The SSA has affirmed that the receipt of unemployment benefits is one factor that an ALJ may take into consideration in determining whether a claimant is disabled.  Pl's brief Exhibit 1; 20 CFR § 404.1512(b).  The Court is unable to follow the ALJ's determination that "[Mr. Bardlett] reported that he previously worked with his impairments and that he was able to be on his feet working part-time and even fulltime with overtime" as showing any inconsistency, at least with regard to his complaints of minor flare-ups.  (R. at 16.)  After all, Mr. Bardlett's testimony provides that, while he was able to make it to work on most days within a given month, he had to take frequent brakes while he was there due to the pain and discomfort. (R. at 36-37.)

Despite the ALJ's identification of two minor inconsistencies pertaining to Mr. Bardlett's work history, the ALJ's classification of certain statements made by Mr. Bardlett concerning his minor flare-ups as "inconsistent," as well as a lack of further review of the evidence, prevents a meaningful review by the Court of the ultimate findings of the SSA.  Remand is therefore merited on this point.

III. *The ALJ's RFC Determination*

Finally, Mr. Bardlett argues that the RFC determination, utilized for steps 4 and 5 of the Sequential Evaluation process,

was incorrect, as the ALJ failed to consider Mr. Bardlett's ability to perform "sustained" work activity. Mr. Bardlett points to SSR 96-8p, finding that an ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)..." 61 FR 34474, 34478. The ALJ found that Mr. Bardlett had the RFC to perform light work, but Mr. Bardlett notes that the ALJ failed to mention "sustained work activities" anywhere in her decision. Pl.'s brief at 7; (R. at 13-16.)

As previously mentioned, the ALJ determined that the extreme flare-ups are no longer an issue as long as Mr. Bardlett stays consistent on his medication and that the bulk of his hospitalizations resulted from missed medication. (R. at 16.) Mr. Bardlett himself testified that, since he began taking the U.S.-available drug in 2011, he has had no problem obtaining the drug, has not missed a dose, and consequentially has not experienced an exacerbation severe enough to send him to the hospital. (R. at 39-40.) Indeed, the record shows that Mr. Bardlett's last documented visit for an extreme flare-up came on 11/21/10, the result of another missed dose when Mr. Bardlett was still ordering the drug from out of the country. (R. at 833.)

That said, the ALJ's failure to consider Mr. Bardlett's ability to conduct "sustained work activities," in regards to

43

those extreme flare-ups is harmless error.  See *Fisher* at 1057.
Again, Mr. Bardlett's now consistent treatment on tranexamic acid
has eliminated extreme flare-ups, as far as the record shows.  To
factor in the limiting effects of the extreme flare-ups, now a
non-issue, on Mr. Bardlett's ability to work on a "sustained"
basis would produce the same finding by the ALJ.

Mr. Bardlett may be correct, however, that the ALJ's failure
to consider his ability to perform "sustained work activities" in
connection with his minor flare-ups is material error.  As Mr.
Bardlett notes, the alleged unpredictable nature of his minor
flare-ups, even when he is on his medication, "would preclude
*full-time* work because his impairment would require frequent
absences."  Pl's brief at 7.  In addition, the VE testified that
all work would be eliminated if Mr. Bardlett had to miss two or
more days per month.  (R. at 48.)

The ALJ's decision to find Mr. Bardlett disabled effectively
hinged on whether or not she would credit Mr. Bardlett's
complaints of continued minor flare-ups, as there was a lack of
objective evidence in the record to support those complaints.
The Court presumes that, because the ALJ did not find those
complaints credible to begin with, she did not find it necessary
to explore "sustained work activities" in connection with his
claimed minor flare-ups, though she may have simply forgotten to
discuss the matter.

Whatever the reason, the lack of clarity herein prevents the Court from making a meaningful review of the ultimate findings of the SSA, and therefore remand on this point is necessary. The Court finds that the ALJ erred by identifying inconstancies as part of the credibility assessment that are not substantiated by the medical record nor by Mr. Bardlett's testimony. Because it is apparent that the ALJ partly misunderstood the nature of Mr. Bardlett's medical condition, on remand the ALJ should attempt to further develop Mr. Bardlett's testimony concerning his minor flare-ups, and re-assess whether those statements are consistent or not with other evidence in the record, in order to determine if claimant is disabled. The ALJ should also consider whether claimant's minor flare-ups, if any, materially affect his ability to perform "sustained work activities."

Conclusion

For the reasons set forth above, the Court grants Mr. Bardlett's motion for summary judgment [#16] and denies the Commissioner's motion for summary judgment [#22]. The case is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.


Date: August 09, 2013

ENTERED:


45

_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT